UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARLENE SLUSSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00718-JRS-DLP |
| | ) | |
| FCA US LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Entry Granting Defendant's Motion for Summary Judgment**

Plaintiff Marlene Slusser alleges claims for disability discrimination against her former employer, Defendant FCA US LLC, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Specifically, Slusser alleges that FCA discriminated against her by failing to provide a reasonable accommodation for her disabilities and by terminating her employment. FCA moves for summary judgment. (ECF No. 37.) FCA's motion is **granted** for the reasons below.

**Background**

Slusser began working at FCA's Kokomo casting plant, which produces automobile parts, as a die caster in 2012. (Slusser Dep. 8:25–9:1, 9:10–13, ECF No. 38-1.) Die casters work in teams of ten to fifteen. (Slusser Dep. 11:11–12.) Typically, thirteen workers operate the die-casting machines and two workers act as floor inspectors. (Slusser Dep. 11:12–16.) On a day-to-day basis, the team operates, maintains, cleans, and troubleshoots the machines. (Slusser Dep. 13:6–10.) Slusser worked in the small components section, producing upper valve bodies, lower valve bodies, and

1

other components. (Slusser Dep. 13:16–19.) As a die caster, Slusser began her shifts by checking her machine's specifications, checking the furnace level of the molten aluminum, checking for leaks of hydraulic fluid, and checking the temperature of the hot oil. (Slusser Dep. 13:22–14:6.) Die casters are responsible for maintaining every aspect of the machine. (Slusser Dep. 14:6–7.) As a die caster operator in small components, Slusser was required to run two machines at the same time. (Slusser Dep. 14:8–9.) At the end of her shift, she was required to shut down her machine, clean it, and restart it for the next shift. (Slusser Dep. 14:9–12.)

Over the course of her employment, Slusser suffered various injuries resulting in work restrictions. (*See* Slusser Dep. Ex. 2, ECF No. 38-1 at 66–67.) In February 2013, Slusser's glove got caught on an engine block, crushing her thumb. (Slusser Dep. 21:5–14, 43:15–17.) FCA's medical department wanted to place Slusser on light duty, but Slusser elected to continue working on engine blocks. (Slusser Dep. 22:23–23:12.)

Shortly thereafter, Slusser fell on the die pit. (Slusser Dep. 23:13–17.) Because the die pit "is so deep and the die cast machine is so big," die casters have to "pop the ladder across while standing on one side to get it to the other side so [the skilled trades] can climb in between the dies and do the repair job." (Slusser Dep. 23:18–24:12.) When Slusser went to "pop the ladder," her foot slipped, and she fell. (Slusser Dep. 24:13–21.) Slusser did not seek any medical treatment, but she did report the incident to her supervisor. (Slusser Dep. 25:5–11.)

On June 13, 2014, while Slusser was steaming her machines, a fork truck's wheels caught the power washer's water line, jerking the wand out of Slusser's hand and tearing the tendon off her left elbow. (Slusser Dep. 25:12–23.) Slusser went to FCA's medical department, which placed her on light duty because she was unable to perform the duties of the die caster position. (Slusser Dep. 26:8–13, 30:17–20.) When Slusser's elbow did not improve after two months of light duty, FCA's plant doctor sent her to an orthopedic specialist. (Slusser Dep. 26:18–23.) Slusser underwent surgery for the injury in January 2015 and continued treatment for the injury until August 2015. (Slusser Dep. 28:1–28:11.)

From June 2014 onward, Slusser was assigned to light duty. Slusser performed various light-duty tasks, reporting to dispatch each day to get her assignment. (Slusser Dep. 67:9–18.) Slusser's assignments while on light duty included cleaning machines in the small components section, (Slusser Dep. 30:21–31:15), reworking small component parts in the containment crib, (Slusser Dep. 29:1–2), customer support in the transmission plant, (Slusser Dep. 66:6–10), and filling in as a small components floor inspector, (Slusser Dep. 10:6–16, 39:8–21).

While working in the containment crib, Slusser tripped over an air hose and injured her knee. (Slusser Dep. 32:2–13.) Slusser does not recall whether she received any medical treatment or additional work restrictions. (Slusser Dep. 32:14–33:6.) In March 2015, Slusser suffered epicondylitis in her right elbow from overwork. (Slusser Dep. 33:7–21.) Slusser's resulting work restrictions varied over the next several months. (*See* Slusser Dep. Ex. 2, ECF No. 38-1 at 66–67.) In July 2015, Slusser

3

suffered injuries to her hip and back in a car accident. (Slusser Dep. 46:13–20.) As a result, she went on short-term disability for two months, after which she returned to light duty under her previous restrictions. (Slusser Dep. 46:10–15, 47:2–10.)

In November 2015, the injuries to Slusser's elbows resulted in permanent restrictions: no lifting over thirty pounds with either arm; no twisting either wrist for more than one-third of a shift; and no gripping with either hand for more than one-third of a shift. (Slusser Dep. 28:9–19, 34:15–19, 36:5–19.) Though Slusser testified that the restrictions were permanent, she also testified that FCA's "medical department can only issue work restrictions for so long before you go back in to see the plant doctor. She will check your progress and then . . . issue work restrictions again[.]" (Slusser Dep. 44:4–10.) FCA's records indicate that Slusser's restrictions had a duration of no more than six months. (Slusser Dep. Ex. 2, ECF No. 38-1 at 66–68.)

In July 2016, Slusser was diagnosed with sleep disorders—narcolepsy, cataplexy, and insomnia—and again went on short-term disability. (Slusser Dep. 48:1–6, 52:19–53:4.) Slusser was never placed on any form of work restriction for her sleep disorders. (Slusser Dep. 54:8–14.) Slusser returned from short-term disability on March 8, 2017. (Slusser Dep. 48:11–13.)

That day, Slusser first visited the medical department to have her restrictions relating to her elbow injuries (lifting, twisting, gripping) reinstated, then reported to dispatch to receive her job assignment. (Slusser Dep. 65:22–66:8.) Her assignment for that day was to provide customer support at the Kokomo transmission plant. (Slusser Dep. 66:9–10.) At some point during her shift in customer support, Slusser

suffered abrasions on her arm. (Slusser Dep. 74:15–17.) She "apparently . . . scraped [her]self on some parts and didn't know it." (Slusser Dep. 74:18–20.) Slusser does not recall how she came to scrape her arm. (Slusser Dep. 74:23–25.) Nor does she recall whether she fell asleep. She has no recollection of the injury. (Slusser Dep. 75:1–2.) She was marking parts; then, the next thing she remembers, she reached down to get a drink and noticed strips of blood running down her arm. (Slusser Dep. 75:9–14.) Slusser did not request medical treatment for the injury. (Slusser Dep. 76:5–9.)

The next day, when Slusser arrived at work, she went to meet with her union president and human resources to discuss issues with her backpay and attendance record and to ask how to request a reasonable accommodation. (Slusser Dep. 68:3–18.) Slusser asked how to request a reasonable accommodation because she "had an issue the previous night." (Slusser Dep. 69:7–9.) She asked an HR employee, Doran Gwyn, who told her that he was not aware of how to request an accommodation. (Slusser Dep. 69:10–70:9.)

Slusser reported to dispatch and was assigned to the containment crib, where she worked for about half an hour. (Slusser Dep. 71:1–3, 8–10.) Then, Slusser's business unit leader, Vaughn James, approached her, told her he was aware of her medical condition, and asked her to sit in the cafeteria for the remainder of her shift. (Slusser Dep. 71:11–17.) Slusser sat in the cafeteria for the rest of her shift then went home. (Slusser Dep. 71:21–72:3.)

5

The next day, March 10, 2017, Slusser reported to dispatch, and her assignment was to immediately report to Marcus Hatcher's office in Labor Relations. (Slusser Dep. 72:8–12.) Slusser reported to Hatcher's office, where she encountered Hatcher, Vaughn James, and two union officials. (Slusser Dep. 72:15–23.) They told Slusser that they had been informed of her narcolepsy and that they could not believe, given her injury on March 8, that a plant doctor had released her to work knowing that she had narcolepsy. (Slusser Dep. 73:2–13.) Slusser showed them her release form from the plant doctor, and Hatcher tried to call the doctor to request a reassessment, but the doctor had already left for the day. (Slusser Dep. 73:13–22.) They told Slusser she would need to go back on short-term disability and go back to her doctor for another release and that they would speak with the plant doctor to ensure he was fully aware of her narcolepsy. (Slusser Dep. 73:23–74:3.)

Hatcher and James then escorted Slusser to the medical department, told the nurse that Slusser was released for medical reasons on their orders, and left Slusser with the nurse. (Slusser Dep. 74:3–8.) The plant nurse initially refused to allow Slusser to leave; after an hour, the nurse relented and allowed Slusser to drive home. (Slusser Dep. 79:10–80:10.)

On June 5, 2017, Slusser's doctor certified that Slusser would be able to return to work without restrictions. (Slusser Dep. 84:18–85:24.) Slusser returned to work on June 8, 2017, and submitted a letter requesting accommodations to Vaughn James. (Slusser Dep. 86:15–87:24.) Slusser requested the following accommodations: (1) to allow her to rest her elbows and hands as needed; (2) "to refrain from any type of

6

going up or down steps, ladders, or similar movements"; (3) "headset [with] white noise"; (4) "flexible start time and/or end time"; and (5) "flexible intermittent leave." (Slusser Dep. Ex. 7, ECF No. 38-1 at 73.) Slusser added that she "will be more than happy to provide medical documentation from [her] physicians stating [her] medical conditions." (*Id.*) Slusser did not know what position she would be returning to in June 2017. (Slusser Dep. 90:22–24.)

Slusser requested the restriction on going up or down steps or ladders because of her cataplexy, which could cause her to "suddenly fall to the floor" and posed a safety risk when working around "1,300- to 1,500-degree molten aluminum" and "600- to 700-degree parts." (Slusser Dep. 94:12–25.) There was no molten metal in the containment crib, where Slusser had worked on a light-duty assignment. (Slusser Dep. 95:9–10, 16–17.)

Slusser requested the white noise headset because "[w]hite noise sometimes helps people with narcolepsy to keep their brain waves active from having the urge to doze off and fall asleep." (Slusser Dep. 95:18–23.) She requested the flexible start and end times so that, in the event she had the urge to fall asleep while driving to work, she could pull over for ten or 15 minutes to sleep. (Slusser Dep. 95:24–96:5.) Slusser requested flexible intermittent leave to be able to make her doctors' appointments and to be able to go home when she had the urge to sleep "instead of . . . sleeping at work, fighting, falling." (Slusser Dep. 97:2–12.)

Slusser never submitted to FCA any form of medical certification regarding the accommodations she requested. (Slusser Dep. 107:16–19.) Slusser asked Marcus

7

Hatcher what medical documentation he would like Slusser's doctor to provide. FCA's HR gave Slusser, through her union, a blank medical records release form to sign. (Slusser Dep. 116:12–117:25.) Slusser declined to sign the form because it "violated [her] rights" by depriving her of "the opportunity to provide the medical documentation [herself]." (Slusser Dep. 118:1–5.)

As of her deposition on November 13, 2018, Slusser had never asked her doctor to certify that she could not go up and down steps or ladders, that she needed a headset with white noise, or that she needed a flexible schedule and flexible intermittent leave. (Slusser Dep. 114:19–115:12.) On December 3, 2018, Slusser's counsel requested a copy of FCA's accommodation form from FCA's counsel, which form FCA's counsel provided. (ECF No. 43-12 at 2.) On December 20, 2018, Slusser's doctor completed the "Medical Inquiry Form for a Reasonable Accommodation Request," certifying that Slusser could "return to previous job with accommodation." (ECF No. 43-5.) Slusser's doctor listed the following accommodations: "(1) flexible schedule – due to sleep disorder the start/stop time may vary by 30 minutes"; "(2) 20-30 minute breaks for naps daily (if needed)"; "(3) avoid steps/ladders (history of sudden falls)"; "(4) needs regular doctor appointments"; and "(5) to help maintain wakefulness, use of headphones for white noise as needed[.]" (ECF No. 43-5 at 2.)

On January 25, 2019, Slusser received a letter from FCA (dated January 15) stating that Slusser had been absent from work since March 10, 2017, and that her seniority would be terminated unless she reported to work or provided evidence of the reason for her absence on or before January 23, 2019. (ECF Nos. 43-6, 43-7.). Slusser

subsequently received a letter from FCA, dated January 25, 2019, stating that her seniority was terminated as of January 23. (ECF No. 43-9.)

**Legal Standard**

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). However, the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and does not draw "inferences that are supported by only speculation or conjecture," *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

To withstand a properly supported motion for summary judgment, Slusser "must do more than raise some metaphysical doubt as to the material facts; [s]he must come forward with specific facts showing that there is a genuine issue for trial." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Discussion**

Slusser alleges both disparate-treatment and failure-to-accommodate claims under the ADA. *See Scheidler v. Indiana*, 914 F.3d 535, 540–41 (7th Cir. 2019) (recognizing that separate disparate-treatment claims and failure-to-accommodate claims are possible under the ADA). "A claim for *disparate treatment* based on disability under the ADA . . . requires proof (1) plaintiff was disabled; (2) plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of adverse employment action." *Id.* at 541. On the other hand, a "claim for *failure to accommodate* under the ADA . . . requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Id.*

As reflected in the second element of a disparate-treatment claim and the first element of a failure-to-accommodate claim, the ADA's protections apply only if the employee is a "qualified individual." *See* 42 U.S.C. § 12112(a). An individual is "qualified" within the meaning of the ADA only if she is able "with or without reasonable accommodation, [to] perform the essential functions of the employment position such individual holds or desires." 42 U.S.C. § 12111(8).

Thus, the threshold question for both claims is whether Slusser was a "qualified individual." FCA argues that Slusser was not a "qualified individual" because she was not able to perform the essential duties of a die caster with or without reasonable accommodation. Slusser responds that there remain genuine issues for trial, namely (1) whether Slusser's position for purposes of her ADA claims was die caster or her

subsequent light-duty assignment to the containment crib and (2) whether Slusser was able to perform the essential duties of the die caster position. FCA is entitled to summary judgment because the record would not allow a reasonable trier of fact to find that Slusser's light-duty assignment was a permanent position or that Slusser was able to perform the essential duties of the die caster position with or without reasonable accommodation.

*1. Slusser's position was die caster, not her light-duty assignment*

Slusser contends that, for purposes of her ADA claims, her light-duty assignment to the containment crib was her *de facto* position, and the essential functions of that assignment are the relevant measure for determining whether she was a qualified individual. An employee's light-duty position may be treated as a permanent reassignment for purposes of accommodation if the employee reasonably regarded the position as permanent. *See Bever v. Titan Wheel Int'l, Inc.*, 6 F. App'x 401, 404 (7th Cir. 2001) (unpublished); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998) ("[I]f the job in which an injured employee was placed is in fact a vacant permanent job . . . then the employee's assignment to that position must be treated as a reassignment to a permanent job for purposes of accommodation."); *id.* at 698 (holding that it was a genuine issue "whether the injured employees knew that the jobs in which they initially were placed were truly temporary or whether they could consider the jobs a reasonable accommodation for their impairments"). Courts confronting this issue have undertaken holistic analyses considering both direct evidence (*i.e.*, the plaintiff's testimony about the nature of her light-duty position) and case-specific,

11

indirect evidence. *See, e.g., Bever*, 6 F. App'x at 404; *Vojaskovic v. Premier Mfg. Support Servs.*, No. 1:05-cv-0116-TAB-DFH, 2006 WL 1594509, at *4 (S.D. Ind. June 6, 2006); *Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1115–18 (S.D. Ill. 2001).

The duration of the assignment matters, but it is not dispositive except in extreme cases. *See Hendricks-Robinson*, 154 F.3d at 697 ("we believe that the temporary nature of a light-duty program should not be adjudged by the absoluteness of the time period in which an injured employee may participate"). Slusser principally relies on one such extreme case, *Achors v. FCA US, LLC*, No. 1:15-cv-2052-SEB-MPB, 2017 WL 4340322, at *6 (S.D. Ind. Sept. 29, 2017), where the defendant employed the plaintiff "for fourteen years after she became disabled and continuously assigned her work as a 'floater' for twelve of those years." The court found that the fourteen-year duration of the light-duty assignment, "long after any characterization of the job as temporary or short-term was reasonable, long after any idea of recovery and return to the assembly-line was practical, and presumably after several permanent positions had become vacant," was a "strong indication that it was not a temporary, stop-gap assignment." *Id.* Thus, the court reasoned that a factfinder could determine that the plaintiff's job "for ADA purposes, was her floater job" and the floater job was therefore "the job for which she must be a qualified individual and which FCA was required to have provided reasonable accommodation[.]" *Id.*

Here, the duration of Slusser's stint on light duty—just over two years, including two months on short-term disability—falls a full decade short of the employee's

twelve-year tenure in *Achors*. For most of that time—seventeen of twenty-five months—Slusser's work restrictions were in flux. Thus, Slusser's light-duty assignment did not last "long after any idea of recovery and return to the assembly-line was practical" or "long after any characterization of the job as temporary or short-term was reasonable[.]" *Id*.

Other factors carry more weight in the run of cases, where, as here, the passage of time does not render unreasonable "any characterization of the job as temporary or short-term." For instance, reassignment to a single, pre-existing position with a job title and job description weighs in favor of finding the position permanent. In *Hendricks-Robinson*, 154 F.3d at 697–98, the Seventh Circuit concluded that there was "a genuine issue as to whether the injured employees knew that [the light duty jobs] were truly temporary" because the "employees were given light-duty positions with no end-date, no specified period for holding the job," and the employer "specifically created light-duty positions in the CBA but did not designate those jobs as 'temporary.'" Similarly, in *Bever*, 6 F. App'x at 403–405, the Seventh Circuit held that a jury could reasonably find that the employee's light-duty job was not temporary where the employee "was allowed to work exclusively [at the light-duty assignment] for nearly a year and a half," two workplace assessments evaluated the employee for the light-duty job (rather than the previous full-duty position), and several internal company memos treated the job as the employee's permanent position.

On the other hand, courts find the jobs to be temporary where the employee does not consider the light-duty assignment to be her position, the light-duty assignments

vary, and the employee is not under permanent work restrictions when placed on light duty. In *Vojaskovic*, 2006 WL 1594509, the plaintiff worked as an industrial cleaner until she suffered a workplace injury. The plaintiff then received a light-duty assignment involving office duties, and she worked in that capacity for about a year. *Id.* at *4. The court held that the only reasonable inference was that the light-duty assignment was temporary, citing the lack of job title, job description, or dedicated work area and evidence that the plaintiff continued to consider her position to be "industrial cleaner." *Id.* In *Williams*, 190 F. Supp. 2d at 1114–18, the employee performed various light-duty assignments for two years. The court concluded that the light-duty assignments did not amount to a permanent position because there was no evidence that the employer knew the employee's restrictions were permanent when it placed him on light duty, and the employer had a policy of not creating permanent light-duty positions.

Here, the uncontroverted, direct evidence shows that Slusser did not regard her light-duty assignment to the containment crib as her permanent position. When asked at her deposition whether she held any positions at FCA other than die caster, Slusser responded that she had held the position of small components floor inspector—filling in for the normal floor inspector—and no other position. (Slusser Dep. 9:10–20, 10:1–19.) Slusser further testified that throughout her time on light duty, she was still considered part of her die caster team. (Slusser Dep. 40:7–21.) *See Vojaskovic*, 2006 WL 1594509, at *4 (finding that employee's reference to her potential replacement in her light-duty assignment as a "new temp" and statement that

14

her position was "industrial cleaner" supported inference that employee's position was industrial cleaner, not the light-duty assignment). And Slusser testified that her request for accommodations in June 2017 was not for any specific position and that she did not know what position she would fill upon her return from short-term disability. (Slusser Dep. 90:15–24.)

The indirect evidence compels the same conclusion. While on light duty, Slusser typically reported to dispatch daily—at minimum, weekly—to receive her assignment. (Slusser Dep. 67:9–68:2.) Although she may have spent the majority of her time on light duty in the containment crib, Slusser's light-duty assignments also included cleaning machines in the small components section, (Slusser Dep. 30:21–31:15), customer support in the transmission plant, (Slusser Dep. 66:6–10), relieving die casting machines, (Slusser Dep. 128:21–24), and filling in as a small components floor inspector, (Slusser Dep. 10:6–16, 39:8–21). That Slusser's light-duty assignment could—and, indeed, did—vary week to week (or even day to day) corroborates the direct evidence that Slusser did not regard her assignment to the containment crib as a permanent position. *Cf. Bever*, 6 F. App'x at 404 (finding inference that light-duty assignment was permanent supported by fact that employee "was allowed to work exclusively [at a single light-duty assignment] for nearly a year and a half.").

Slusser's work restrictions were temporary when she was first assigned to light duty in June 2014, and those restrictions did not become permanent (from Slusser's perspective) until November 2015. (Slusser Dep. 34:14–35:10; *id.* Ex. 2, ECF No. 38-1 at 66–68.) *See Williams*, 190 F. Supp. 2d at 1118 ("Williams has not directed this

15

Court to any evidence that Eastside knew he was permanently, medically restricted when it placed him on light duty"). Slusser knew that FCA did not consider her stint on light duty permanent—she testified that FCA's medical department does not issue permanent work restrictions, (Slusser Dep. 44:4–10), and she periodically had "to check in with the medical department . . . to make sure that there[ ] [had] been no changes." (Slusser Dep. 45:5–10.) Upon returning to work from short-term disability on March 8, 2017, Slusser first went to the medical department to have her elbow-related restrictions reinstated. (Slusser Dep. 65:22–66:1.) *Cf. Bever*, 6 F. App'x at 405 (finding HR manager's statement that employee could return to work full-time "regular duty with no restrictions" supported inference that light-duty position was employee's permanent position).

In short, the record as a whole would not permit a reasonable trier of fact to conclude that Slusser reasonably regarded her light-duty assignment to the containment crib as a permanent position.

*2. Slusser was not a "qualified individual" for the die caster position*

Thus, Slusser was a "qualified individual" only if she was able to perform the essential duties of the die caster position with or without reasonable accommodation. The record contains no written job description for the die caster position. But on Slusser's own admission, she was incapable of performing the die caster job under her elbow-related restrictions—restrictions that Slusser described as "permanent" and "lifetime." (Slusser Dep. 31:12–23.) Slusser, moreover, conceded that her cataplexy made it hazardous for her to work around molten aluminum and scalding-hot

16

parts—both part-and-parcel of the die caster position as Slusser described it. (Slusser Dep. 13:22–14:6, 94:12–25.) *See Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 484 (7th Cir. 2002) ("However vague his official job description might have been, it is clear from the record that it required a significant degree of field work and mobility. Dvorak himself claimed that he no longer possessed those functions."); *Wright v. Owens-Illinois, Inc.*, Cause No. 2:02-cv-223-LJM-WGH, 2004 WL 1087359, at *14 (S.D. Ind. 2004) (finding that employee could not perform essential functions of the position from employee's testimony, despite lack of a written job description).

Despite these admissions, Slusser contends that it nevertheless remains a genuine issue for trial whether she can perform the essential duties of a die caster. First, Slusser argues that her admissions related only to 2014 to 2016, when her elbow-related restrictions were in place. (ECF No. 42 at 12.) But Slusser testified that those restrictions were never lifted, (Slusser Dep. 31:16–20), that those restrictions "are lifetime restrictions," (Slusser Dep. 31:21–23), and that she had those restrictions reinstated upon returning to work on March 8, 2017, (Slusser Dep. 65:22–66:5). FCA's records indicate that Slusser's restrictions remained in place through August 1, 2017. (Slusser Dep. Ex. 2, ECF No. 38-1 at 66.)

In further support, Slusser argues that her doctor has since certified that she can return to work as a die caster with certain accommodations. The certification at issue lacks any indicia that the doctor considered the duties of a die caster in reaching his conclusion—the section for identifying job duties that would be affected by Slusser's restrictions absent accommodation is completely blank. (ECF No. 34-1.) Moreover,

17

the certification addresses only Slusser's narcolepsy, cataplexy, and migraines, ignoring the pertinent elbow-related restrictions completely. (ECF No. 34-1 at 1.)

Second, Slusser argues that her ability to perform the essential duties of the die caster position remains a genuine issue because she has not tried to operate every single die-casting machine, so it is possible that she could operate one of FCA's machines. (ECF No. 42 at 12.) As the plaintiff, Slusser "bears the burden of placing [her]self within the confines of the statute by at least creating a genuine issue of material fact as to whether [s]he is a 'qualified individual with a disability'." *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997). Slusser's speculation that she may be able to operate some unidentified die-casting machine "does not meet [her] burden of producing some defense to a summary judgment motion." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). Given Slusser's testimony (and the lack of other evidence), no reasonable jury could find that Slusser was able to perform the essential duties of the die caster position without accommodation. And Slusser presents no evidence that a reasonable accommodation would enable her to perform the essential duties of the die caster position. Therefore, on this record, no reasonable jury could fine that Slusser was a "qualified individual" for the die caster position, and FCA is entitled to summary judgment.

## Conclusion

For the reasons above, FCA's motion for summary judgment (ECF No. 37) is **granted**, and Slusser's claims are **dismissed** on the merits **with prejudice**. Final judgment will be entered separately.

Date: 11/26/2019

_/s/ James R. Sweeney II_
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

**SO ORDERED.**

Distribution:

Zachary A. Ahonen
JACKSON LEWIS PC (Indianapolis)
zachary.ahonen@jacksonlewis.com

Christopher E. Clark
GOODIN ABERNATHY LLP
cclark@goodinabernathy.com

Michael W. Padgett
JACKSON LEWIS PC (Indianapolis)
padgettm@jacksonlewis.com